## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:15-CR-00088 |
| v. | (Chief Judge Brann) |
| JEMEL LAQUAN KING, | |
| Defendant. | |

### MEMORANDUM OPINION

### JULY 18, 2025

Jemel Laquan King was tried and convicted by a jury of, among other crimes, armed bank robbery. He now argues that his convictions and sentence should be vacated because his trial attorney was constitutionally ineffective, and his Constitutional rights were violated when his motion to replace counsel was denied without a hearing. The facts, however, reveal that King's attorney performed well under the circumstances and, accordingly, there was no ineffective assistance of counsel. For similar reasons, any error in failing to hold a hearing regarding replacement counsel was not structural and does not warrant vacating King's convictions. His pending motion will therefore be denied.

## I.    BACKGROUND

In May 2015, King was indicted for conspiracy to commit armed bank robbery, in violation of 18 U.S.C. §§ 871, 2113(d), armed bank robbery, in violation of 18 U.S.C. §§ 2, 2113(d), and using or brandishing a firearm during and in relation

to a crime of violence, in violation of 18 U.S.C. §§ 2, 924(c).[1] This matter was assigned to the Honorable James M. Munley[2] and proceeded in the ordinary course.

In July 2015, King filed a motion to appoint new counsel, asserting that trial counsel was pressuring King into pleading guilty before even reviewing discovery with King.[3] The following day, Judge Munley denied that motion, observing that King "complains about a difference of opinion with respect to plea negotiations" and this was insufficient to necessitate substitution of counsel.[4] King did not file another motion to substitute counsel, and the case proceeded to trial. Following a four-day jury trial, King was convicted on all counts.[5]

At trial, the Government presented evidence that King and his coconspirator, Jule Futrell, robbed an NBT Bank in Scranton, Pennsylvania (the "Bank"). At trial, Debra Walski—the branch manager of the Bank—testified that, just before 5 p.m. on the day of the robbery, she was about to close the Bank for the evening when two men wearing masks and gloves entered the Bank—one of whom carried a firearm.[6] Walski was ordered to get onto her knees, and later forced to escort the robbers to the Bank's vault before she was ordered to get onto her knees again and was

---

[1]    Doc. 1.
[2]    Judge Munley is now deceased, and this matter was reassigned to the Undersigned on May 3, 2021.
[3]    Doc. 33.
[4]    Doc. 34.
[5]    Doc. 72.
[6]    Doc. 97 at 22-28.

handcuffed.[7] One of the robbers informed Walski that they knew all about her, what kind of vehicle she drove, where she lived, and the fact that her home had a for sale sign in the front yard.[8] The robbers eventually forced the employees to open the Bank's vault and fled with approximately $110,000 in cash, leaving the employees inside of the vault.[9] Another employee provided similar testimony[10] and additionally stated that she heard someone speaking to one of the robbers through an earpiece.[11]

Shortly after the robbery, police recovered the vehicle that had been driven by the bank robbers, although it yielded no further clues.[12] They further received information from a witness—George Churillo—who stated that, near the Bank approximately two weeks prior to the robbery, he observed a red Dodge Caravan driven by a man who "appeared to be casing the area" in preparation for a bank robbery; Churillo believed the New York license plate number for that vehicle was F2H4344.[13] A search for that license plate revealed nothing, but a search for license plate number FZH4344 matched to a red Dodge minivan registered in New York state.[14] That minivan had been rented by the grandmother of Dorian Whitehead, who was then Futrell's girlfriend.[15]

---

[7]   *Id.* at 29-30.
[8]   *Id.* at 31.
[9]   *Id.* at 32-37.
[10]  *Id.* at 67-91.
[11]  *Id.* at 75-76.
[12]  Doc. 98 at 5-6.
[13]  *Id.* at 10-13, 25-30.
[14]  *Id.* at 13.
[15]  Doc. 99 at 150-51.

Futrell testified that he had pled guilty to several crimes, including robbing the NBT Bank.[16] He further testified that he had robbed the Bank with the help of Whitehead and his friend King, also known as Mellow.[17] Futrell and King initially began to plan the robbery because both were having financial difficulties and a bank was the only location that would have a significant sum of cash on hand.[18] In preparation for the robbery, Futrell had Whitehead's grandmother rent a vehicle and he used that vehicle to travel and surveil the Bank; during one such trip he encountered Churillo.[19] In preparation for the robbery he and King also followed a bank employee to her home to learn where she lived.[20]

Futrell testified that, on the day of the robbery, he and King drove to Scranton in a van that belonged to King's girlfriend's brother and left it at a park several blocks from the Bank, near where Futrell had previously parked a stolen vehicle.[21] Once arriving at the park, Futrell and King put their masks and other gear on, entered the stolen vehicle, and drove it to the Bank.[22] The two men entered the Bank, forced the employees to open the vault, stole the money, put the employees in the vault, and left—all within three to four minutes.[23] During the robbery, Whitehead was

---

[16]  Doc. 98 at 40-41.
[17]  *Id.* at 58; *see id.* at 46-53.
[18]  *Id.* at 54-59.
[19]  *Id.* at 60-62.
[20]  *Id.* at 65-68.
[21]  *Id.* at 80-81; *see id.* at 72, 76.
[22]  *Id.* at 81-85.
[23]  *Id.* at 89-94.

monitoring police activity from a separate location and communicating with Futrell.[24]

Futrell stated that, after robbing the Bank, he and King exited the Bank and drove the stolen vehicle back to where the van was parked, then sprayed the inside of the stolen vehicle with cleaning solution.[25] The two drove the van south to ensure they were not being followed before driving to Whitehead's house.[26] During the robbery, Futrell and King had left their phones behind and disabled them by removing the battery to try to prevent the phones from "pinging off" the cell towers in the vicinity of the Bank.[27] Following the robbery, the conspirators thoroughly cleaned the van they used for the robbery.[28] After his arrest, Futrell quickly confessed to his role in the robbery and identified Whitehead and King as his coconspirators.[29] Whitehead provided testimony that aligned with Futrell's testimony.[30]

The Government also presented the expert testimony of Anthony Imel, a photographic technologist for the Federal Bureau of Investigation.[31] In that position,

---

[24]  *Id.* at 90-91.
[25]  *Id.* at 85.
[26]  *Id.* at 86-88, 94-95.
[27]  *Id.* at 95-96.
[28]  *Id.* at 99-101. Storm Kurtz—the sister of King's girlfriend—testified that she gave the keys for her van to her sister on the day of the robbery and, when she used the van the following day, it was extremely clean. *Id.* at 183-94. Storm Kurtz further testified that she knew neither Futrell nor Whitehead. *Id.* at 196.
[29]  *Id.* at 104-08.
[30]  Doc. 99 at 25-63.
[31]  Doc. 98 at 200-26.

among other things, Imel was responsible for determining the height of individuals based on video footage.[32] Imel had performed that work since 2001, had taken classes on the subject, conducted thousands of analyses, and taught classes on making such height determinations.[33] Based on his analysis, Imel determined that the individual who robbed the Bank with Futrell was approximately six feet and four inches tall which, according to various studies and reports, is taller than 97 to 99 percent of the population of the United States.[34]

Finally, Philadelphia Police Department Detective Anthony Vega testified as an expert witness on cellular analysis.[35] He noted that cellular data could not place King or Futrell in the area around the Bank on the day of the robbery, only at their residences.[36] Vega stated that, from approximately 3:30 p.m. on the day of the robbery until 8 a.m. the following morning, there was no cell phone location information related to King's cell phone despite incoming text messages and phone calls.[37] To Vega that meant that, during that time, King's "phone was not in contact with the network. So it was either turned off, the battery was pulled, or it was in

---

[32] *Id.* at 201.
[33] *Id.* at 202-06.
[34] *Id.* at 213-18. 97 percent referenced the male population only, while 99 percent was in reference to the entire population. *Id.*
[35] Doc. 99 at 89-148.
[36] *Id.* at 116-29.
[37] *Id.* at 130-31.

airplane mode."[38] Futrell's phone was disconnected from cellular networks during that same period of time.[39]

At the conclusion of the jury trial, King was convicted of all counts.[40] Judge Munley subsequently sentenced King to a total term of 157 months' imprisonment.[41]

On appeal, the United States Court of Appeals for the Third Circuit affirmed King's convictions and sentence.[42] King argued—as relevant here—that Judge Munley erred in denying, without a hearing, King's motion for replacement counsel.[43] The Third Circuit noted that the Government had conceded Judge Munley had abused his "discretion by failing to inquire into the basis of the motion" but did not find in King's favor, concluding that it could not determine whether that error was structural and, therefore, the issue had to be raised in a 28 U.S.C. § 2255 motion.[44]

King has now filed such a motion.[45] King raises two issues in his § 2255 motion: that trial counsel was ineffective, and that King's due process rights were violated by the denial, without a hearing, of his motion to appoint replacement counsel.[46] As to his assertion of ineffective assistance of counsel, he contends that

---

[38]  *Id.* at 131.
[39]  *Id.* at 131-40.
[40]  Doc. 72.
[41]  Doc. 90.
[42]  *United States v. King*, No. 16-3329, 2022 WL 1451391, at *2 (3d Cir. May 9, 2022).
[43]  *Id.* at *2.
[44]  *Id.*
[45]  Doc. 112.
[46]  Docs. 112, 113.

trial counsel: (1) failed to interview King at all and was only interested in having King enter a guilty plea; and (2) failed to pursue (or investigate) a valid defense, namely, that King was an unwitting participant in the crime who did not know that the others were robbing a bank until after the robbery occurred, thereby depriving him of the mens rea necessary to form a conspiracy or to aid and abet the crime.[47] King also argues that he may be entitled to a presumption of prejudice due to the complete breakdown in relations with trial counsel.[48]

With regard to the alleged due process violation, King asserts that it was error for Judge Munley to have denied his motion to appoint new counsel without holding a hearing to explore the reasons behind that motion.[49] King further argues that he was prejudiced by this, as he and his attorney "outright hated each other" and trial counsel did not prepare for trial or pursue King's chosen defense which, he asserts, was the only viable defense.[50]

---

[47]  Doc. 113 at 9-13.
[48]  *Id.* at 14. There does not appear to have been a complete breakdown in relations, and this argument is without merit. During the evidentiary hearing, King and his appointed attorney also asserted that trial counsel may have been ineffective for failing to attempt to exclude Imel's expert testimony regarding the bank robber's height. This argument is insufficiently developed and, in any event, there is no evidence that such opinion was excludable, or that its exclusion would have impacted the guilty verdicts. And trial counsel testified at the evidentiary hearing that he recalled researching the issue and determining that the testimony was likely admissible and that any motion to exclude would be denied. Consequently, his performance would not have been deficient.
[49]  *Id.* at 15.
[50]  *Id.* at 15-16.

The Government responds that King's motion is without merit.[51] As to King's ineffective assistance of counsel claim, the Government notes that many of his claims—those related to counsel's refusal to review discovery, interview King, or let King testify—are contradicted by King himself.[52] For example, despite King's claim that trial counsel refused to interview him, King notes that counsel visited him approximately every two weeks.[53] Similarly, as to King's claim that counsel never reviewed discovery, King states that trial counsel watched surveillance tapes with King that had been provided during discovery.[54] Finally, contrary to King's assertion that trial counsel refused to permit King to testify, Judge Munley informed King of his right to testify, but King stated that he did not wish to do so.[55] In any event, the Government notes that King's conviction was supported by overwhelming evidence of guilt, meaning King cannot establish prejudice.[56]

The Government further argues that King's due process claim is without merit, as there was no structural error since trial counsel was constitutionally effective. Moreover, the motion to replace counsel was made only two months after King was indicted, and he never again raised any complaints with trial counsel.[57]

---

[51] Doc. 117.
[52] *Id.* at 17-20.
[53] *Id.* at 17-18.
[54] *Id.* at 18-19.
[55] *Id.* at 20.
[56] *Id.* at 15.
[57] *Id.* at 16. The Government initially argued that King's Due Process claim was raised, and rejected, on appeal, and therefore cannot be raised in this motion. *Id.* at 15-16. However, a new

King filed a reply brief[58] and, based on the allegations and evidence presented, this Court determined that an evidentiary hearing was necessary and appointed an attorney to represent King at that hearing.[59] The evidentiary hearing was conducted on June 12, 2025, rendering this matter ripe for disposition. For the reasons discussed below, the Court will deny King's motion.

## II.    DISCUSSION

### A.    Ineffective Assistance of Counsel Claims

King first alleges that that he received ineffective assistance of counsel. "In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court established a two-part test to evaluate ineffective assistance of counsel claims."[60] "The first part of the *Strickland* test requires 'showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"[61] In determining whether an attorney's performance is deficient, courts must "determine whether, in light of all the circumstances, the [attorney's] acts or omissions were outside the wide range of professionally competent assistance."[62] As the United States Supreme Court has emphasized:

---

attorney entered an appearance for the Government prior to the evidentiary hearing, and he wisely abandoned that argument when questioned about it during the hearing.

[58]    Doc. 118.

[59]    Docs. 122, 123.

[60]    *United States v. Bui*, 795 F.3d 363, 366 (3d Cir. 2015).

[61]    *Id.* (quoting *Strickland*, 466 U.S. at 687).

[62]    *Strickland*, 466 U.S. at 690.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[63]

"The second part [of the *Strickland* test] specifies that the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"[64] "This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable."[65] In other words, a movant must establish a "a substantial likelihood" that any errors "changed the outcome of . . . trial."[66]

Under that standard, the Court cannot conclude that trial counsel was anything but effective. As to King's assertion that trial counsel did not interview King or adequately prepare for trial, that assertion is directly undercut by the evidence presented during the evidentiary hearing, and by King's own admissions. King

---

[63] *Id.*
[64] *Bui*, 795 F.3d at 366 (quoting *Strickland*, 466 U.S. at 694).
[65] *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks omitted).
[66] *Branch v. Sweeney*, 758 F.3d 226, 238 (3d Cir. 2014).

acknowledged in his § 2255 motion that he met with trial counsel approximately once every two weeks in preparation for trial,[67] and stated during the evidentiary hearing that he had met with trial counsel numerous times. Trial counsel testified that he met with King eighteen or nineteen times prior to trial. He testified credibly that, during those meetings, he discussed with King the indictment, reviewed discovery, received input regarding the allegations, sought information about individuals who may be able to testify on King's behalf at trial, and discussed trial strategy as well as King's version of his activities on the day of the robbery.

With regard to the failure to put King on the witness stand and pursue the defense that King was an unwitting participant in the crime, there is no evidence of ineffective assistance of counsel. First, both trial counsel and King testified that trial counsel had informed King that it was his right, and decision, to testify at trial. Indeed, Judge Munley informed King that he had the Constitutional right to testify and queried whether he wished to exercise that right; King confirmed that he did not "want to testify."[68]

Both King and trial counsel agree that trial counsel advised King that it would be best if he did not testify at trial. But there was a good strategic reason for this advice. King's version of the events of the day of the robbery was that he was an unwitting accomplice—he believed he was driving with Futrell to Scranton to pick

---

[67]    Doc. 112-1 at 2.
[68]    Doc. 99 at 212.

up a vehicle, and did not know that Futrell had robbed the Bank until after the robbery had occurred. But trial counsel was reasonably concerned that such testimony would severely damage King's credibility, and he felt that credibility was central to the case.

Providing this reasonable advice to King was not only appropriate, but required—indeed, the failure to advise King of the difficulties that could arise because of such testimony may well have itself constituted ineffective assistance of counsel. As the United States Court of Appeals for the Eleventh Circuit has explained, "[d]efense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide" but "if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify."[69] That is exactly what trial counsel did here.

Importantly, his advice was not at all deficient. There is little doubt that King's proposed testimony would have been undermined by the Government. For example, while King maintained that he was traveling with Futrell to pick up a vehicle, the Government would likely point out that, by the time of the robbery, Futrell's car dealership had gone out of business, and he would have had no reason to travel to

---

[69] *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992).

Scranton to pick up a vehicle.[70] The Government would also likely have questioned why, if King believed he was making a simple car pickup, he would disable his cellphone and leave it in the Binghamton, New York area, rather than take it with him to Scranton.[71] Given the lack of physical evidence connecting King to the robbery, trial counsel was not wrong that credibility—both King's and the defense witnesses'—would be central to the case, and did not perform deficiently in advising King that testifying may be damaging to his credibility and, ultimately, his defense.[72]

Next, while King contends that putting him on the stand to testify was the only valid defense, that is simply not true, and trial counsel performed admirably in trying to undermine a strong Government case. Trial counsel attempted to undermine Futrell's credibility by pointing out his criminal history, that he had spent time as a fugitive, as well as his history of lying and deceitfulness, illegal gambling, and possible fraudulent behavior.[73] Trial counsel emphasized that it was Futrell alone

---

[70] *See* Doc. 98 at 39, 48-50, 56 (Futrell testimony that King previously assisted him in picking up vehicles for Futrell's car dealership, but that the dealership went out of business in 2013).

[71] *See* Doc. 98 at 95-96 (Futrell testimony that he and King disabled their cellphones and left them in New York); Doc. 99 at 130-31 (Vega testimony that during the afternoon of the robbery and into the following morning King's cellphone was not connected to a cellular network, and the phone both disconnected and reconnected to the network near his home).

[72] King also argued at the evidentiary hearing that there was an individual in a bar who may have seen King waiting in a van while the robbery was occurring, and counsel was ineffective in failing to secure the testimony of that individual. But it strains credulity to believe that one person in a bar would have seen and remembered, in the dark, a random individual in a random van in a parking lot—let alone have noted the exact time and known that he saw King precisely when the Bank was being robbed. There is simply no evidence that the individual, if he existed, may have had any relevant testimony to offer, or that the individual's testimony would have in any way altered the outcome of the trial.

[73] Doc. 98 at 109-38.

14

who scouted the Bank ahead of time and purchased the equipment that would be used in the robbery.[74] He cross-examined Futrell on the fact that he would receive a sentence reduction for his testimony against King, and therefore may have had reason to pin the crime on another individual.[75] Trial counsel similarly attacked Whitehead's credibility by emphasizing that she was testifying to try to get a lighter sentence, and by noting that she had initially lied to police.[76]

Trial counsel also subtly pointed the jury to another possible suspect who could have been Futrell's accomplice.[77] He attempted to present an alibi witness in the form of Spring Kurtz, who testified that King was at her home for at least part of the day of the robbery, and that they still struggled financially after the robbery, implying that King had not come into a large sum of money that would have been expected after a bank robbery.[78]

These were skillful attempts to undermine the Government's case and obtain an acquittal without requiring that King testify, which trial counsel reasonably worried was a doomed strategy. As the Supreme Court has emphasized, "[c]ounsel [i]s entitled to formulate a strategy that [i]s reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."[79] This is not a

---

[74]  *Id.* at 140-41.
[75]  *Id.* at 173-80.
[76]  Doc. 99 at 67-72, 81-85.
[77]  Doc. 98 at 21-23.
[78]  Doc. 99 at 204-07.
[79]  *Harrington*, 562 U.S. at 107.

case where trial counsel failed to pursue an obviously meritorious defense in favor of a weaker or frivolous defense. Rather, trial counsel made a reasonable decision to "avoid activities that appear distractive from more important duties"[80] and instead pursued a defense that he reasonably determined stood a better chance of success.

Of course, the jury ultimately found this defense unavailing, and it is tempting to believe that the better course of action may have been for counsel to pursue a different strategy centered around King's testimony. The Court is mindful, however, "that '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . .'"[81] Counsel pursued a viable strategy, and the Court cannot conclude that his performance was deficient, or that King was prejudiced in any way by counsel's performance. Consequently, the Court detemines that there was no ineffective assistance of counsel, and this claim will be denied.

### B.    Due Process

Next, King argues that Judge Munley's decision to deny—without holding a hearing—King's motion to appoint replacement counsel violated his due process rights.[82]

---

[80]    *Id.*
[81]    *United States v. Sepling*, 944 F.3d 138, 146 (3d Cir. 2019) (quoting *Strickland*, 466 U.S. at 689).
[82]    Doc. 113 at 15-16.

The United States Court of Appeals for the Third Circuit has explained that "indigent defendants are permitted to request the appointment of new counsel, or to proceed pro se, if they are unhappy with their current court-appointed attorney" but any such motion must be evaluated under a good cause standard.[83] Good cause "can be a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict with the attorney."[84] "The district court must engage in at least some inquiry as to the reason for the defendant's dissatisfaction with his existing attorney to determine whether the defendant has shown good cause."[85]

Where a court fails to engage in any inquiry regarding this standard "it abuses its discretion."[86] However, the failure to inquire as to whether good cause exists to replace counsel does not mean that a defendant's due process rights were violated.[87] That is "because the right to choose one's own counsel does not extend to defendants who require appointed counsel" and, when a defendant proceeds to trial with an attorney—even one with whom he is dissatisfied—he cannot claim "that he was denied the right to any counsel at all."[88] In such circumstances, courts must "examine the record for identifiable mistakes and assess whether those mistakes affected the

---

[83] *United States v. Senke*, 986 F.3d 300, 309 (3d Cir. 2021).
[84] *Id.* at 309-10 (internal quotation marks omitted).
[85] *Id.* at 310 (brackets and internal quotation marks omitted).
[86] *Id.* at 311 (internal quotation marks omitted).
[87] *Id.* at 313-15.
[88] *Id.* at 314.

outcome of his trial."[89] Such a "claim is therefore more appropriately viewed as one for ineffectiveness, which must be reviewed for prejudice."[90]

Here, it is beyond dispute that Judge Munley erred when he denied King's motion to appoint counsel without undertaking any inquiry as to the reasons for the motion, as the Third Circuit held on direct appeal.[91] However, for the reasons discussed above, King cannot make out a viable case that he received ineffective assistance of counsel. He cannot establish any prejudice from the failure to replace his trial attorney, who performed well in defending King at trial. King points to no identifiable mistakes that affected the outcome of his trial, and his due process rights therefore were not violated by the denial of his motion to appoint replacement counsel.

## C.    Certificate of Appealability

Because this Court will deny King's § 2255 motion, this decision is not appealable unless this Court or a circuit justice issues a certificate of appealability.[92] A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right."[93] To satisfy this standard King must demonstrate that reasonable jurists would find that the Court's assessment of the constitutional

---

[89] *Id.*
[90] *Id.* at 314-15.
[91] *King*, 2022 WL 1451391 at *2.
[92] 28 U.S.C. § 2253(c)(1)(B).
[93] *Id.* § 2253(c)(2).

claims is debatable or wrong.[94] This Court concludes that King has not met this burden, and therefore declines to issue a certificate of appealability.

## III.    CONCLUSION

For the foregoing reasons, the Court concludes that King's 28 U.S.C. § 2255 motion is without merit, and that motion will be denied. The Court will also deny a certificate of appealability.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[94] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).